UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| MICHAEL VENTI,<br><br>　　　　　Plaintiff,<br><br>v.<br><br>XEROX CORPORATION, a New York Corporation, and JOHN DOE CORPORATIONS I-V,<br><br>　　　　　Defendants. | Case No. 1:21-cv-00131-DKG<br><br>**MEMORANDUM DECISION AND ORDER** |

## INTRODUCTION

Before the Court are Plaintiff's Motion for Partial Summary Judgment, and Defendant's Motion for Summary Judgment and Motion to Strike. (Dkts. 76, 80, 83.) The Motions are fully briefed and ripe for the Court's consideration. The Court conducted a video hearing on May 8, 2023. After careful consideration of the record, the parties' briefing, supporting materials, oral argument, and the relevant legal authorities, the Court will deny Plaintiff's motion for partial summary judgment and will grant in part and deny in part Defendant's motion for summary judgment. The motion to strike will be granted in part and denied in part.

# BACKGROUND

Plaintiff Michael Venti began his employment with Defendant Xerox Corporation in 1998. On May 4, 2017, Venti was promoted to general manager for the United States on Defendant's global distribution operations (Disti) team by way of an Offer Letter (2017 Offer Letter). (Dkt. 76-2, Aff. Venti, Ex. 1.) The 2017 Offer Letter provided that Plaintiff's compensation would be split 75/25, whereby Plaintiff received 75% of his compensation as a base salary of $104,500.00,[1] and 25% as performance based incentive compensation. *Id.* Plaintiff's base salary was paid monthly. *Id.*

In 2017, 2018, and 2019, the performance based portion of Plaintiff's wage was determined by an annual Sales Incentive Compensation Plan (SICP). (Dkt. 80-3, Dec. Cox, Exs. A-3, A-4, A-5, A-6.) The SICPs issued for 2017, 2018, and 2019 generally provided that a portion of the incentive compensation would be paid monthly as an "advance" or "draw," and the remainder would be paid quarterly as a "true-up" for any incentive compensation due based on a calculation involving several performance factors such as: achievement of on target earnings (OTE), accelerators, over-performance, and multipliers. *Id.*; and (Dkt. 76-1 at ¶¶ 2-3) (citing Dkt. 76-2, Aff. Venti, Exs. 1, 2.)[2]

---

[1] Plaintiff's base salary was increased to $108,640.00 in April 2018. (Dkt. 80-4, Dec. Cox, Ex. A-21.)

[2] Plaintiff's statement of undisputed facts is incorporated on pages two and three of his supporting memorandum (Dkt. 76-1), rather than in a separately filed statement of facts as directed by Local Civil Rule 7.1(b)(1). The Court will use paragraph numbers when referring to Plaintiff's statement of undisputed facts, and will use page numbers when referring to other portions of the supporting memorandum.

In early 2020, no new SICP was issued for the Disti team. The parties dispute whether and what compensation plan or policy, if any, applied during the first nine months of 2020. During that time, Plaintiff alleges he and other members of the Disti team were concerned that there was no 2020 SICP, and that they believed the 2019 SICP continued to govern payment of the performance based portion of their compensation until a new SICP was adopted. (Dkt. 1-4 at ¶ 15); (Dkt. 76-2, Aff. Venti at ¶¶ 8-9.) Xerox contends that no SICP was in place for 2020, and that during early 2020 it continued to pay Plaintiff's base salary and monthly performance advances in accordance with the 2017 Offer Letter. (Dkt. 80-1 at ¶¶ 22-23.) Relevant to the period of time from Q4 2019 to October 2020, the parties disagree concerning whether Plaintiff met his performance targets and whether the incentive compensation paid to Plaintiff was in accord with the plan in effect at the time, if any.[3] (Dkt. 76-1 at ¶ 8); (Dkt. 82-1 at ¶ 8); (Dkt. 80-1 at ¶¶ 18-19, 23, 28, 32); (Dkt. 86-1 at ¶¶ 17-19, 23, 28, 32.)

Also during this time, Xerox maintains that it was undertaking a review of the Disti team's compensation incentive structure, and evaluating whether the Disti team was properly classified as performing sales functions. (Dkt. 80-1 at ¶ 21); (Dkt. 80-3, Dec. Cox at ¶¶ 28, 39.) The parties disagree on this point. Plaintiff maintains the Disti team performed sales functions and, therefore, was properly compensated under a SICP. (Dkt. 86-1 at ¶¶ 5, 8.) Xerox, on the other hand, contends the functions of the Disti team were

---

[3] The Court adopts the parties' use of "Q" to abbreviate references to a fiscal quarter for a given year.

more appropriately categorized as management and should be compensated using a Management Incentive Plan (MIP). (Dkt. 80-1 at ¶¶ 5-8, 21, 27.)

In May 2020, a revised SICP was prepared which proposed changes to the payment structure for the Disti team. (Dkt. 80-3, Dec. Cox at Exs. A-10, A-11, A-12.) Plaintiff and others on the Disti team opposed the proposed changes in the revised SICP and communicated their concerns to Xerox. (Dkt. 1-4 at ¶¶ 17-18, 20-22); (Dkt. 80-3, Dec. Cox at ¶¶ 36-38.) In September 2020, Xerox proposed a new MIP for the Disti team, rather than a SICP, which restructured the Disti team's performance based compensation. (Dkt. 1-4 at ¶ 23); (Dkt. 80-1 at ¶ 30.) The parties dispute whether the compensation plans were offers subject to acceptance by the employees, or whether Xerox could unilaterally change the compensation plans without prior notice. (Dkt. 80-1 at ¶ 7) ("Xerox's incentive compensation plans are unilateral and non-negotiable. Xerox reserves the right to discontinue or modify the plans at any time and without prior notice."); (Dkt. 86-1 at ¶ 7) ("Venti admits Xerox issued plans and Venti had the right to accept the offer or not. Venti accepted the 2017-2019 plans that were issued," but did not accept the 2020 MIP.)

The Disti team, including Plaintiff, opposed the MIP, alleging it substantially reduced each of their overall compensation. (Dkt. 1-4 at ¶ 24); (Dkt. 86-1 at ¶ 31.) Plaintiff further contends that during his review of sales figures provided by Defendant, he "discovered abnormalities in the commissions and compensation paid in Q4 2019." (Dkt. 1-4 at ¶ 25); (Dkt. 86-2, Supp. Dec. Venti at ¶¶ 9-10.) Plaintiff alleges Defendant's actions constitute "breaches of the [Disti] team's employment contracts and unfair labor practices." (Dkt. 1-4 at ¶ 25.) Consequently, on September 22, 2020 and September 28, 2020, Plaintiff

filed ethics complaints on behalf of the Disti team using Xerox's internal processes. (Dkt. 80-1 at ¶ 34); (Dkt. 86-1 at ¶ 34).[4]

On or about October 8, 2020, Plaintiff was informed that his position had been eliminated, and that his employment was being terminated due to an involuntary reduction in force (IRIF), effective October 22, 2020. (Dkt. 1-4 at ¶ 26); (Dkt. 76-2, Aff. Venti at ¶ 17); (Dkt. 80-7, Depo. Venti, Ex. C-25.) Xerox maintains that during early 2020, it was engaged in ongoing efforts to streamline its organization by reducing middle management positions – a process referred to as "spans and layers reductions" – which incorporated "right-sizing" the Disti team. (Dkt. 80-1 at ¶ 37.) Xerox asserts the recommendation made by Plaintiff's supervisor, Laurent Ramanathan, to eliminate six positions from the Disti team, including Plaintiff's position, was made on September 23, 2020. (Dkt. 80-1 at ¶ 38.) Xerox contends that Plaintiff's termination was not the result of his opposition to the MIP or the complaints he filed. (Dkt. 80-1 at ¶¶ 39-41.)[5]

Plaintiff disputes that his termination was the result of the IRIF, arguing instead that his employment was terminated in retaliation for his opposition to the compensation plans and complaints. (Dkt. 86-2, Supp. Dec. Venti at ¶ 18.) The parties further dispute whether

---

[4] The Complaint represents that Venti filed ethics complaints on behalf of the Disti team on September 29, 2020 and October 5, 2020. (Dkt. 1-4 at ¶ 25.) However, the actual copies of the complaints themselves submitted by both Plaintiff and Defendant are dated September 22, 2020 and September 28, 2020. (Dkt. 80-7, Dec. Cox, Exs. 22, 23); (Dkt. 86-2, Supp. Dec. Venti, Exs. 12, 13.)

[5] Xerox further represents that its restructuring was made during the height of the COVID-19 pandemic, which impacted the company's business and the Disti team's ability to meet its performance goals. Plaintiff disputes this contention, maintaining the Disti team outperformed its goals during 2020.

Plaintiff was replaced following his discharge. (Dkt. 80-1 at ¶ 39); (Dkt. 86-2, Supp. Dec. Venti at ¶ 23.) Later, in February 2021, Plaintiff was not hired for a short-term contractor position with Defendant. (Dkt. 1-4 at ¶¶ 27-28); (Dkt. 80-1 at ¶ 42.)

On March 1, 2021, Plaintiff filed the instant action against Defendant in Idaho state court, alleging claims for unpaid wages, pursuant to Idaho Code Sections 45-606 and 45-615; wage retaliation pursuant to Idaho Code Section 45-613; breach of contract and violation of public policy. (Dkt. 1-2.) One day later, on March 2, 2021, Plaintiff filed his First Amended Complaint adding a claim for negligent infliction of emotional distress. (Dkt. 1-4.) Defendant removed the matter to this Court on March 19, 2021. (Dkt. 1.)

On November 10, 2022, Plaintiff filed a Motion for Partial Summary Judgment. (Dkt. 76.) Defendant filed its Motion for Summary Judgment and related Motion to Strike on January 20, 2023. (Dkt. 80, 83.) The Court finds as follows.[6]

## LEGAL STANDARD

This case is before the Court based on diversity jurisdiction, pursuant to 28 U.S.C. § 1332. (Dkt. 1.) "[F]ederal courts sitting in diversity apply state substantive law and federal procedural law." *Gasperini v. Center for Humanities, Inc.*, 518 U.S. 415, 427 (1996) (citing *Erie R.R. Co. v. Tompkins*, 304 U.S. 64 (1938)).

Here, "[t]he 'procedural aspects of summary judgment' are governed by the Federal Rules of Civil Procedure, and 'the law of the forum controls the substantive issues.'" *Cuprite Mine Partners LLC v. Anderson*, 809 F.3d 548, 554 (9th Cir. 2015) (quoting

---

[6] The parties have consented to proceed before a United States Magistrate Judge in this matter pursuant to 28 U.S.C. § 636(c)(1) and Local Civil Rule 72.1(a)(1). (Dkt. 6.)

*Caesar Elecs., Inc. v. Andrews*, 905 F.2d 287, 290 n. 3 (9th Cir. 1990)). Summary judgment is appropriate where a party demonstrates that, as to any claim or defense, "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A material fact is a fact "that may affect the outcome of the case." *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 247-48 (1986).

The moving party bears the initial burden of demonstrating the absence of a genuine dispute as to material fact and a favorable judgment is due as a matter of law. *Devereaux v. Abbey*, 263 F.3d 1070, 1076 (9th Cir. 2001) (en banc); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the moving party satisfies this initial burden, the non-moving party must identify facts sufficient to show a genuine issue for trial to defeat the motion for summary judgment. *Cline v. Indus. Maint. Eng'g & Contracting Co*., 200 F.3d 1223, 1229 (9th Cir. 2000). The non-moving party must go beyond the pleadings and show "by…affidavits, or by the depositions, answers to interrogatories, or admissions on file," that a genuine dispute of material fact exists. *Celotex*, 477 U.S. at 324. The Court must grant summary judgment if the non-moving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Id*. at 322.

When cross-motions for summary judgment are filed, the Court "evaluate[s] each motion separately, giving the non-moving party in each instance the benefit of all reasonable inferences." *A.C.L.U. of Nev. v. City of Las Vegas*, 466 F.3d 784, 790-91 (9th Cir. 2006) (quotation marks and citation omitted); *see also Pintos v. Pac. Creditors Ass'n*, 605 F.3d 665, 674 (9th Cir. 2010) ("Cross-motions for summary judgment are evaluated

separately under [the] same standard."). In evaluating these motions, a court "must consider each party's evidence, regardless under which motion the evidence is offered." *Las Vegas Sands, LLC v. Nehme*, 632 F.3d 526, 532 (9th Cir. 2011).

## DISCUSSION

### 1. Defendant's Motion to Strike[7]

### A. Standard of Law

Federal Rule 56(c) governs the procedures that the parties must comply with to support or dispute a motion for summary judgment. *See* Fed. R. Civ. P. 56(c). Under Rule 56(c)(2), a party "may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence." *Id*. An affidavit is an acceptable form in which to present evidence in the summary judgment context. However, "[a]n affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4). Facts alleged on understanding, such as on belief or on information and belief, are not sufficient to create a genuine issue of fact. *Cermetek, Inc. v. Butler Avpak, Inc*., 573 F.2d 1370, 1377 (9th Cir. 1978). A motion for summary judgment will not be defeated by mere conclusory allegations unsupported by factual data. *Seattle–First Nat'l Bank v. United States*, 653 F.2d 1293, 1299 (9th Cir. 1981).

---

[7] The Court's rulings on the motion to strike stated herein are limited to consideration of the evidence for purposes of the pending summary judgment motions. The Court makes no determination regarding the admissibility of any evidence at trial.

Rule 56 makes clear then that only admissible evidence may be considered in ruling on a motion for summary judgment. *Orr v. Bank of America*, 285 F.3d 764, 773 (9th Cir. 2002); *see also* Fed. R. Civ. P. 56(c). However, in determining admissibility for summary judgment purposes, it is the contents of the evidence rather than its form that must be considered. *Fraser v. Goodale*, 342 F .3d 1032, 1036–37 (9th Cir. 2003). If the contents of the evidence could be presented in an admissible form at trial, those contents may be considered on summary judgment even if the evidence itself is hearsay. *Id.* (affirming consideration of hearsay contents of plaintiff's diary on summary judgment because at trial, plaintiff's testimony of contents would not be hearsay).

### B.  Analysis

Defendant moves to strike Paragraphs 11, and 15 through 18 in the Affidavit of Michael Venti filed in support of Plaintiff's Motion for Partial Summary Judgment, arguing the Paragraphs contain statements which are inadmissible because they are conclusory, speculative, without support or foundation, not based upon personal knowledge, and are hearsay. Specifically, Defendant challenges Plaintiff's statements that he understood the 2019 SICP continued to govern the terms of his incentive compensation in early 2020, that he met his performance targets, and that he is owed $45,251.41 for Q4 2019 through Q3 2020.

For purposes of deciding the summary judgment motions, the Court finds the following self-serving, conclusory statements are inadmissible: that the terms of the 2019 SICP continued to apply in 2020, Plaintiff met his performance goals and is entitled to payment, and that Plaintiff's calculations of what he claims he is owed for Q4 2019 to Q3

2020 are correct. The Court will grant the motion to strike and will not consider the bare assertions contained in Paragraphs 11, and 15 through 18. However, other non-conclusory attestations contained in these paragraphs will be considered, to the extent the content of the statements offer evidence which may be presented in an admissible form at trial. The admissibility of any of Plaintiff's statements at trial is not decided here.

Next, Defendant moves to strike the chart displayed on page two of Exhibit 5 attached to the Affidavit of Michael Venti. (Dkt. 83.) Defendant argues the chart lacks authenticity, foundation, and personal knowledge as to where the chart originated, who created the chart, and how it was received and by whom. Further, Defendant asserts the chart is incomplete and that it is neither a business record nor an admission of a party opponent. Plaintiff maintains the chart is admissible under Federal Rule of Evidence 1006 as a summary of his wages owed, and that its foundation and authenticity are established by other materials produced in discovery.

Paragraph 15 of Venti's Affidavit states that the chart in Exhibit 5 contains his compensation and commission calculations. It goes on to represent that Venti met with his supervisor multiple times between May and October of 2020, to get assistance calculating the commissions owed for Q4 2019 through Q3 2020, and that Venti is "knowledgeable of the formula as well as my actual performance." (Dkt. 76-2, Aff. Venti at ¶ 15.) Paragraph 16 and 18 represent that the chart is a screenshot obtained from Plaintiff's supervisor Laurent Ramanathan and Ashley Bristow. (Dkt. 76-2, Aff. Venti at ¶¶ 16, 18.)

While Plaintiff's Affidavit is somewhat confusing and difficult to track, the Court finds the representations contained in Plaintiff's Affidavit and the later filed Supplemental

Declaration of Venti, are sufficient to demonstrate that the content of the chart could potentially be admissible evidence. (Dkt. 76-2, Aff. Venti); (Dkt. 86-2, Supp. Dec. Venti.) Accordingly, the motion to strike will be denied as to the chart in Exhibit 5. Whether the chart or any testimony relating to the chart is ultimately admitted during trial, which is far from certain, will depend on how it is offered, and whether the offering party can establish its authenticity, lay a proper foundation, and otherwise satisfy the requirements for its admission.

## 2. Summary Judgment Motions

### A. Claim One – Unpaid Wages

Plaintiff moves for partial summary judgment on his claim for unpaid wages brought pursuant to Idaho Code Section 45-606. (Dkt. 76.) Defendant opposes the motion and, in turn, has moved for summary judgment on this claim in its favor. (Dkts. 80-2, 82.) "Idaho's Wage Claim Act [IWCA] governs an employee's claim to wages against a former employer." *Smith v. Kount, Inc.*, 497 P.3d 534, 537 (Idaho 2021). The Idaho Supreme Court has described the claim as follows:

> When an employee separates from his employer, the [IWCA] requires the employer to pay "all wages then due the employee" on the next scheduled payday or within ten days, whichever is sooner. [Idaho Code] § 45-606(1). In determining whether wages are "due" to an employee and thus required to be paid under Idaho Code section 45-606(1), "this Court often looks to whether the employee is entitled to the wages for services rendered or whether there is more they must do in order to be entitled to the wages." *Savage v. Scandit, Inc.*, [417 P.3d 234, 238 (Idaho 2018)] (citations omitted). "If the employee was entitled to the commission at the time he brought the suit it would fall under the IWCA, if there was more that he was required to do then it would not." *Id.*

*Id.* at 537-38. Whether wages were "due" at the time of an employee's separation depends upon the terms of the employee's contract. *Id.*

Here, Plaintiff argues he is entitled to payment of unpaid incentive compensation earned between Q4 2019 and Q3 2020, in the amount of $45,251.41, as calculated under the terms of the 2019 SICP. (Dkts. 76, 84, 86.) Defendant, on the other hand, contends Plaintiff has failed to demonstrate that he earned and is owed any unpaid commissions for Q4 2019 or any of 2020. (Dkts. 80, 82, 89.) The Court finds genuine issues of material fact are in dispute concerning the terms of Plaintiff's incentive compensation which preclude summary judgment in favor of either party on this claim.

As to Q4 2019, Plaintiff asserts he is owed $4,579.28, due to his actual performance being 171% of his target and the commission multipliers in the 2019 SICP. (Dkt. 84 at 5, 8); (Dkt. 86.) Defendant argues Plaintiff received all 2019 commissions owed, totaling $13,327.43, as calculated using the variable pay calculator spreadsheet tool contained the 2019 SICP formula and a target performance of 153%. (Dkt. 80-2 at 6) (citing Dkt. 80-1 at ¶ 17.)

The evidence cited by the parties on this point is disputed, establishing the existence of genuine issues of material fact concerning whether the wages paid to Plaintiff for Q4 2019 were calculated consistent with the terms of the 2019 SICP, and whether any unpaid wages are due to Plaintiff. Emails authored by Plaintiff's superior, Laurent Ramanathan, indicate an "ASP" figure may have been omitted from the commissions calculations for Q2, Q3, and Q4 of 2019, and that any error in the calculation should be adjusted. (Dkt. 86-3, Dec. G. Hepworth, Ex. M.) However, emails responding to Ramanathan's comment

dispute whether ASP was a component of the calculation or that the commissions calculation was otherwise inaccurate. *Id.*[8] Further, other conflicting evidence concerning the amount Plaintiff claims is owed for Q4 2019 gives rise to a dispute on this claim. *See e.g.*, (Dkt. 80-3, Dec. Cox, Ex. A-7) *cited by* (Dkt. 82 at 7-8), (Dkt. 84 at 3), and (Dkt. 89 at 4-5.); and (Dkt. 86-2, Supp. Dec. Venti, Ex. 14.)[9]

Based on the foregoing, the Court finds the evidence relevant to whether the calculation and payment of wages to Plaintiff for Q4 2019 were correct is contested. Summary judgment is therefore precluded on this claim because there is a genuine dispute as to whether wages were due to Plaintiff for Q4 2019 at the time of his separation from employment and, if so, what amount of wages was due, if any.

As to the first three fiscal quarters of 2020, the Court again finds genuine issues of material fact are in dispute. The parties each point to evidence upon which a jury could reasonably find in their favor on the questions of how Plaintiff's commission should have been calculated for 2020, and whether any wages were due to Plaintiff for 2020 at the time of his separation.

---

[8] During the hearing, Defendant argued ASP was not relevant to the incentive compensation calculation. It is impossible for the Court to make that determination as a matter of law based on the record presently before it, given the several disputed facts that exist concerning the calculation of Plaintiff's incentive compensation. (Dkt. 86-3, Dec. G. Hepworth, Ex. M.) For the same reason, it is equally impossible to conclude as a matter of law that Plaintiff is entitled to additional incentive compensation for Q4 2019, or that the amount Plaintiff claims he is owed is correct.

[9] The amount Plaintiff asserts is due as a matter of law for Q4 2019 is inconsistent throughout Plaintiff's briefing. *Compare* (Dkt. 84 at 8) ($4,579.28); (Dkt. 86 at 5) ($4,519.13). Defendant noted the variance in its briefing. (Dkt. 89 at 4-5, n. 10.) This discrepancy further demonstrates the existence of genuine issues of material fact concerning the claim for unpaid wages as to Q4 2019, which precludes summary judgment.

Most notably, the parties hotly contest what terms, if any, governed the calculation of Plaintiff's incentive commission in 2020. Plaintiff argues he is entitled to $13,557.38 for each of the first three quarters in 2020, totaling $40,672.14, based on the 2019 SICP. (Dkt. 84 at 3-5, 8.) Defendant maintains Plaintiff is not due "extra" wages as he was paid more in 2020 than he was eligible for under the 2017 Offer Letter and there was no other agreement governing the terms of his 2020 incentive compensation. (Dkt. 80-2 at 7-10); (Dkt. 82 at 8-16.) Further, Defendant strongly disputes Plaintiff's calculation of the commission he claims he is due for 2020.

The Court finds there is evidence upon which a reasonable jury could find Plaintiff was due unpaid wages at the time of his discharge or, alternatively, could find that no wages were due to Plaintiff. It is undisputed that there was no SICP for the Disti Team in 2020. Rather, Defendant proposed a 2020 SICP in May of 2020, which was opposed by the Disti team and never implemented. (Dkt. 80-3, Dec. Cox, Exs. A-11, A-12.) Defendant then notified Plaintiff of the new MIP compensation structure on September 22, 2020. (Dkt. 76-2, Aff. Venti, Ex. 3); (Dkt. 80-7, Depo. Venti, Ex. C-20.)

Prior to receiving notification of the MIP, in May or June 2020, there is evidence that Plaintiff was aware of the fact that Defendant was considering making changes to the incentive compensation structure for the Disti Team. (Dkt. 76-2, Aff. Venti at ¶¶ 8, 9); (Dkt. 80-6, Depo. Venti at 110:2-13, 113:20-21; and Ex. C-11); (Dkt. 1-4 at ¶¶ 15, 17.) However, Plaintiff maintains he continued working in the absence of a new plan believing the terms and conditions of his 2017 Offer Letter and the 2019 SICP continued to apply. (Dkt. 80-3, Dec. Cox, Ex. A-12); (Dkt. 1-4 at ¶ 15.) Plaintiff argues his belief that the 2019

SICP continued to remain in effect through 2020 was based on representations made by his supervisor that the quarterly true-up was "delayed," and Defendant's course of actual performance. (Dkt. 84 at 8); (Dkt. 86-2 at ¶ 7.) In particular, Plaintiff points out that the SICPs in prior years were not issued at the beginning of each year and that Defendant continued to provide monthly incentive payments until May 2020 as it had during 2017-2019. (Dkt. 84 at 8.)

Defendant, on the other hand, maintains there was no agreement on how the performance based incentive portion of Plaintiff's 2020 compensation would be measured, calculated, or paid prior to the MIP. (Dkt. 82 at 12-13); (Dkt. 80-7, Depo. Venti, Ex. C-17, VENTI-00984.) Further, Defendant contends that it could increase an employee's wages without notice and retroactively. (Dkt. 82 at 11.) Further, Defendant argues it could and did unilaterally make changes to employee wages, which Plaintiff never opposed in the 2017, 2018, or 2019 SICPs. (Dkt. 82 at 11.)

The evidence identified by the parties in support of their positions establishes the existence of a genuine dispute concerning what terms governed Plaintiff's compensation in 2020, if any. Likewise, the parties' present conflicting calculations of the wages they assert were owed to Plaintiff in 2020. This, the Court finds, establishes the existence of genuine issues of material fact in dispute concerning whether Plaintiff is due any wages for Q1-Q3 of 2020. Accordingly, the motions for summary judgment will be denied as to the claim for unpaid wages.

### B.  Claim Two - Wage Retaliation

The IWCA protects employees from retaliatory discharges. Specifically, Idaho Code Section 45-613 provides as follows:

> No employer shall discharge or in any other manner retaliate against any employee because that employee has made a complaint to the employer, or to the department, or filed suit alleging that the employee has not been paid in accordance with the provisions of this chapter, or because the employee has testified or may be about to testify in an investigation or hearing undertaken by the department.

Applying the above-quoted language here, Plaintiff is entitled to recover on his wage retaliation claim if he can show that he complained to Defendant that he had not been paid in accordance with the provisions of Chapter Six of Title 45 of the Idaho Code, and that, as a result of the complaint, Defendant retaliated against him.

The parties agree that the wage retaliation claim requires Plaintiff to prove that: 1) he engaged in protected activity; 2) he suffered an adverse employment action; and 3) there is a causal link between the protected activity and the adverse employment action. (Dkt. 80-2 at 10); (Dkt. 86 at 12).

There are disputed issues of material fact concerning whether Plaintiff was discharged in October of 2020 because he complained about unpaid wages. Construing the evidence in the light most favorable to Plaintiff, the Court concludes that a reasonable jury could find the termination of Plaintiff's employment was retaliatory given the close temporal proximity between when Plaintiff filed complaints with Defendant's Human Resources Department - on September 22, 2020 and September 28, 2020 – and when Plaintiff received notification of his discharge on October 8, 2020. *See Strother v. Southern*

*California Permanente Medical Group*, 79 F.3d 859, 870-71 (9th Cir. 1996) (noting that the temporal proximity of an adverse action to a protected activity contributes to a reasonable inference of an employer's retaliatory motive).

Further, Plaintiff has come forward with evidence that Xerox knew of his wage complaints prior to and shortly before Plaintiff was terminated. (Dkt. 86 at 14-16); (Dkt. 86-1 at ¶¶ 33-41.) Defendant has similarly submitted evidence that the decision to discharge Plaintiff was non-retaliatory and based on the IRIF. (Dkt. 80-1 at ¶¶ 37-41.) However, construing the inferences and facts in favor of the non-moving party, a jury could find that the temporal proximity and other evidence identified by Plaintiff rebuts Defendant's proffered reason for termination. Thus, a genuine issue of material fact has been established. Defendant's motion for summary judgment will be denied as to the wage retaliation claim as it relates to Plaintiff's termination in October of 2020.

However, the Court finds Plaintiff has failed to identify any evidence upon which a jury could find that Xerox did not rehire Plaintiff or did not consider him for a position in February of 2021, in retaliation for Plaintiff's actions and complaints in 2020. Closeness in time may be evidence upon which a jury could find Plaintiff's termination was retaliatory, but the same is not true with regard to the February 2021 position. The temporal proximity between the complaints and the February 2021 position is simply too attenuated,

on its own, to establish retaliation. And, Plaintiff has not identified any other evidence to support the claim.[10]

This is particularly true given Xerox's policy that former employees discharged due to a IRIF are not eligible for rehire until after a one year waiting period. (Dkt. 80-4, Dec. Cox, Ex. A-20.) While that policy may allow for exceptions at Xerox's discretion, Plaintiff failed to identify evidence showing Xerox's decision to not exercise that option was retaliatory. Indeed, Plaintiff has not pointed to any evidence upon which a jury could find that Xerox retaliated against Plaintiff in relation to the February 2021 position. Accordingly, Defendant's motion for summary judgment will be granted in this respect. Plaintiff's claim for wage retaliation based on any alleged failure to rehire or consider Plaintiff for a later position is dismissed and may not be raised during trial.

### C. Claim Three - Breach of Contract and Violation of Public Policy

Plaintiff's third claim alleges Defendant violated Idaho public policy under Idaho Code Section 44-701, and breached the implied covenant of good faith and fair dealing found in all employment contracts. (Dkt. 1-4 at ¶¶ 49-60.) These are two separate and distinct claims – one sounding in tort and the other in contract. However, Plaintiff's pleading, briefing on the present motions, and arguments during the hearing address the two theories interchangeably. Plaintiff generally contends that Defendant interfered with his legal right to negotiate the terms of his employment, and otherwise retaliated against

---

[10] During the motions hearing, Plaintiff's counsel presented various arguments of his position on this claim, but failed to identify any evidence to support the arguments. Arguments of counsel, however, are not evidence sufficient to overcome a summary judgment.

him for participating in concerted activities. (Dkt. 1-4 at ¶¶ 52-55.) The actionable conduct alleged by Plaintiff is Defendant's retaliatory termination of Plaintiff's employment, and later refusal to consider or rehire Plaintiff for an open position in 2021. (Dkt. 1-4 at ¶¶ 49-60); (Dkt. 86 at 2, 17-18.)[11] The Court will address each theory below in turn.

### i.   Violation of Public Policy

There is no dispute that Plaintiff was an at-will employee of Xerox. (Dkt. 80-4, Ex. A-19.)[12] In Idaho, "[u]nless an employee is hired pursuant to a contract which specifies the duration of the employment, or limits the reasons why the employee may be discharged, the employee is 'at will.'" *Harris v. Treasure Canyon Calcium Co.*, 132 F.Supp.3d 1228, 1238 (D. Idaho 2015) (quoting *Venable v. Internet Auto Rent & Sales, Inc.*, 329 P.3d 356, 360 (Idaho 2014)). An at-will employee may be terminated "at any time [or] for any reason without creating liability." *Edmondson v. Shearer Lumber Products*, 75 P.3d 733, 737 (Idaho 2003). Idaho has, however, long recognized "a narrow exception to the at-will employment presumption where the employer's motivation for the termination contravenes public policy." *Harris*, 132 F.Supp.3d at 1238 (quoting *Bollinger v. Fall River Rural Elec. Co-op., Inc.*, 272 P.3d 1263, 1271 (Idaho 2012)). "When a termination violates public

---

[11] The arguments of Plaintiff's counsel during the motions hearing were the same.

[12] Prior to the May 8, 2023 motions hearing, Plaintiff's position concerning the nature of his employment relationship with Xerox was unclear and, thus, it was unknown whether there was any dispute concerning the same. (Dkt. 76-1 at 1) ("Venti entered into a written contract of employment on May 4, 2017…."); (Dkt. 82-1 at 2, 5) (denying that Venti had any employment contract with Xerox, and arguing Venti was employed at-will). However during the hearing, counsel for Plaintiff unequivocally stated that there was no dispute that Plaintiff was an at-will employee.

policy, the tort of wrongful discharge is established." *Wallis v. J.R. Simplot Co., Inc.*, 1992 WL 613354, at \*2 (D. Idaho Feb.12, 1992).

"A termination contravenes public policy only where an employee is terminated for engaging in some protected activity, which includes (1) refusing to commit an unlawful act, (2) performing an important public obligation, or (3) exercising certain legal rights and privileges." *Harris*, 132 F.Supp.3d at 1238. To bring a successful claim under the public policy exception to the at-will employment presumption, "an employee must show (1) that she was engaged in a legally protected activity; and (2) that there is a causal relationship between her engagement in the protected activity and her termination." *Id*. In the absence of case law or statutory language, however, there is "no basis for expanding the Idaho law that defines the public policy exception to the at-will doctrine." *Edmondson*, 75 P.3d at 738 (Idaho 2003) (quoting *Lord v. Swire Pacific Holdings, Inc.*, 203 F.Supp.2d 1175, 1180 (D. Idaho 2002)).

Whether a particular action falls within the public policy exception is a question of law. *Edmondson*, 75 P.3d at 737. The question of causation is generally one for the jury, but "it may be decided as a matter of law where there exists no genuine issue of fact." *Harris*, 132 F.Supp.3d at 1240 (quoting *Bollinger*, 272 P.3d at 1271-72). When evaluating the violation of public policy claim on summary judgment, the Court "carefully reviews the record to determine whether reasonable minds could come to differing conclusions regarding why the adverse action was taken." *Harris*, 132 F.Supp.3d at 1239 (declining to apply the *McDonnell Douglas* burden shifting framework to the state-based claim of wrongful termination in violation of public policy).

Here, Plaintiff alleges he was engaged in protected and concerted activities with members of the Disti team to discuss the terms and conditions of their employment, collective bargaining, potential future strikes, and filing claims for unfair labor practices - all of which was known to Xerox. (Dkt. 1-4 at ¶¶ 50-54.) Plaintiff contends that Xerox violated Idaho public policy by interfering with his legal right to negotiate the terms and conditions of his employment, and otherwise retaliated against Venti for participation in concerted activities. (Dkt. 1-4 at ¶ 55.)

Plaintiff's allegations and arguments on this claim overlap with Plaintiff's statutory wage retaliation claim. For instance, both the wage retaliation claim and the public policy claim are based on allegations that Plaintiff: complained to Xerox about unpaid wages earned by himself and other members of the Disti team beginning in May 2020, continued to oppose the proposed changes to the compensation plan on behalf of himself and the other members of the Disti team throughout the remainder of his employment at Xerox, filed formal complaints concerning Xerox's withholding of wages and unfair labor practices in September 2020, and was terminated from employment shortly after filing the complaints. (Dkt. 1-4 at ¶¶ 40-44, 52-56); (Dkt. 86 at 2-3, 10-18.)

Where an adequate statutory remedy is available for the same allegations that make up a common law public policy claim, the latter is precluded as duplicative. *See McWilliams v. Latah Sanitation, Inc.*, 554 F.Supp.2d 1165, 1185 (D. Idaho 2008) ("[S]tatutory remedies under the ADA for the same allegations asserted within a wrongful discharge [in violation of public policy] claim necessarily preclude the latter, separate, duplicative claim."); *Van v. Portneuf Med. Ctr.*, 212 P.3d 982 (Idaho 2009) (Termination

in violation of Idaho Whistleblower Act does not give rise to a claim under the public policy exception to at-will employment.). Here, Plaintiff's common law claim for violation of public policy is precluded as a matter of law as duplicative, because it is based on the same allegations as his statutory wage retaliation claim. For this reason, summary judgment will be granted in favor of Defendant on the public policy claim.

Further, Plaintiff's contention that his participation in collective bargaining and efforts to negotiate terms of employment are protected under Idaho Code Section 44-701, fails to establish a public policy claim. Again, "[i]n order for the public policy exception to apply, the discharged employee must: (1) refuse to commit an unlawful act, (2) perform an important public obligation; or (3) exercise certain rights or privileges." *Thomas v. Med. Ctr. Physicians, P.A.*, 61 P.3d 557, 564 (Idaho 2002); *Crea v. FMC Corp.*, 16 P.3d 272, 275 (Idaho 2000) (same).

Here, however, Plaintiff does not claim that he refused to commit an unlawful act, and has not demonstrated that he was performing an important public obligation or was exercising certain legal rights and privileges. Plaintiff relies on *Watson v. Idaho Falls Consolidated Hospitals, In*c., 720 P.2d 632, 638 (Idaho 1986), to argue his participation in associations and collective bargaining was a protected activity in support of his claim for wrongful termination in violation of Idaho public policy. (Dkt. 86 at 17-18.)

In *Watson*, the Idaho Supreme Court noted that Idaho Code Section 44-701 protected participation in union activities, but did not decide whether discharge for union activities was a violation of Idaho public policy. *Id.* at 636 (finding the trial court did not err in instructing the jury on plaintiff's theory of termination in violation of public policy

because of pro-union activities). However, courts confronting the issue since *Watson* have concluded that termination because of participation in union activities is a violation of public policy and an exception to at-will employment. *See Purkey v. Rubino*, 2006 WL 3497267, at *14 (D. Idaho Dec. 4, 2006) (discussing *Roberts v. Board of Trustees*, 11 P.3d 1108, 1111 (Idaho 2000)). Thus, there exists a public policy exception to at-will employment for participation in union activities. That, however, does not end the inquiry.

Plaintiff must also establish that he was engaged in a legally protected activity – e.g., "acted in a manner sufficiently in furtherance of that policy" - and that his termination was in fact motivated by his participation in that activity. *Thomas*, 61 P.3d at 565. "Although that question of causation is generally one for the jury, it may be decided as a matter of law where there exists no genuine issue of fact." *Id.* Further, "to survive a motion for summary judgment the defending party must present more than mere allegations, [and] the alleged facts must present more than a mere scintilla of evidence supporting the defending party's position.' *Ray v. Nampa School Dist. No. 131*, 814 P.2d 17, 21 (Idaho 1990) (citations omitted).

In this case, Plaintiff has failed to point to evidence upon which a jury could find that he was engaged in a protected activity, because the collective bargaining protections of Idaho Code Section 44-701 alleged in the public policy claim do not apply to Plaintiff.

Idaho Code Section 44-701 is modeled on the Norris-LaGuardia Anti-Injunction Act, 29 U.S.C. § 102, which was enacted to limit courts from issuing injunctions against individuals engaged in concerted action and collective bargaining in labor disputes, so as to protect the rights of "individual workmen" to associate, self-organize, and designate

representatives to negotiate the terms and conditions of employment. *United States v. Hutcheson*, 312 U.S. 219, 235-236 (1941); *Marine Cooks v. Panama S.S. Co*., 362 U.S. 365, 369-370, n. 7 (1960) (enactment of Norris-LaGuardia "was prompted by a desire ... to withdraw federal courts from a type of controversy for which many believed they were ill-suited").

The right to engage in collective bargaining and other concerted activities is in turn protected by the National Labor Relations Act (NLRA). *See* 29 U.S.C. §§ 152(3), 157, 158(a)(1), 164(a). However, individuals designated as supervisors are generally exempt from the protections to engage in collective bargaining and union activities afforded to employees under the NLRA. *See Florida Power & Light Co. v. International Broth. of Elec. Workers, Local 641, et al.*, 417 U.S. 790, 808 (1974) (holding employer retains the right to refuse to discharge supervisors for involvement in union activities or union membership and to refuse to engage in collective bargaining with supervisors under the NLRA); *Parker-Robb Chevrolet, Inc. et al.*, 262 NLRB 402, 404 (1982) (It is settled law that the "discharge of supervisors as a result of their participation in union or concerted activity – either by themselves or when allied with rank-and-file employees – is not unlawful ...."); 29 U.S.C. § 152(3) (NLRA definition of "employee" excludes any individual employed as a supervisor.).

Here, prior to initiating this lawsuit, Plaintiff filed a charge with the National Labor Relations Board (NLRB) asserting that Defendant violated the NLRA by engaging in unfair labor practices. The NLRB concluded that Plaintiff was a supervisor and, for that

reason, dismissed the charge. (Dkt. 80-4, Dec. Cox, Ex. A-22.) Plaintiff disagreed with and unsuccessfully challenged the NLRB's conclusion.

In this ensuing lawsuit, Plaintiff's public policy claim alleges he was engaged in protected concerted activities under Idaho Code Section 44-701, but not the NLRA. This appears to be an attempt to circumvent the NLRA's exclusion of supervisors from the collective bargaining protections and the NLRB's determination that Plaintiff was a supervisor. However, nothing in Idaho Code Section 44-701 suggests that the collective bargaining protections afforded to individual workers should extend to supervisors in contravention of the well-established precedent to the contrary. To hold otherwise in the absence of any authority for doing so, would be an improper expansion of the laws governing collective bargaining under the guise of public policy.

Further, it is likely the provisions of the NLRA excluding supervisors from the definition of "employee" preempt any alternative interpretation made under state law. *See Beasley v. Food Fair of North Carolina, Inc.*, 416 U.S. 653, 657-62 (1974) (holding section 14(a) of the NLRA contained an express provision relieving employers from treating supervisors as employees under federal or state law relating to collective bargaining); *St. Thomas-St. John Hotel & Tourism Ass'n. Inc. v. Gov't of the United States Virgin Islands ex rel. Virgin Islands Dep't of Labor*, 357 F.3d 297, 303 (3rd Cir. 2004); *Weiss v. Growers*, 2005 WL 8158970, at *2 (E.D. Wash. June 30, 2005) (finding 20 U.S.C. § 164(a) may preempt any state law cause of action relevant to prohibiting injunctions in labor disputes that lumps supervisory employees into the same category as other employees for purposes of collective bargaining). Moreover, the determination of whether an individual is a

supervisor or employee is for the NLRB to decide. *Local No. 207, Int'l Ass'n of Bridge, Structural & Ornamental Iron Workers Union v. Perko*, 373 U.S. 701, 706 (1963); *Local 926, Intern. Union of Operating Engineers, ALF-CIO v. Jones*, 460 U.S. 669, 680-681 (1983) (The pre-emption doctrine not only mandates substantive pre-emption by the federal law in the areas to which it applies, but also protects the exclusive jurisdiction of the NLRB over matters arguably within the NLRA reach.).

Based on the foregoing and construing the facts and inferences in the light most favorable to Plaintiff, the Court finds Plaintiff has failed to point to evidence demonstrating that he was exercising certain legal rights and privileges protected by public policy.

Further, Plaintiff has not identified evidence showing that he was performing in an important public obligation. While Idaho Code Section 44-701 establishes a public policy protecting an individual employee's participation in union activities, subsequent case law has further defined the "type of 'public obligation' sufficient to trigger the public policy exception" to require that there be some legal obligation to act and, that the obligation be "truly public" such that it "serve[s] a public, rather than a private, interest." *Paolini v. Albertson's, Inc.*, 2003 WL 27386675, at *17 (D. Idaho Aug. 7, 2003). Here, Plaintiff has failed to establish that his decision to participate in collective bargaining and contract negotiations was public in nature or legally obligated. *Id.* Rather, Plaintiff's interest in contesting the changes to the Disti team's compensation structure proposed by Defendant in 2020 was a personal choice, not a public obligation. Thus, the protection afforded by the public policy exception to the employment-at-will rule for engaging in a public obligation is not invoked under the circumstances as alleged by Plaintiff here. *Id.*

In conclusion and based on the foregoing, the Court finds as a matter of law that Plaintiff has not established a violation of public policy even when construing the facts and all reasonable inferences in Plaintiff's favor. *See Berrett v. Clark County School Dist. No. 161*, 454 P.3d 555, 569 (Idaho 2019) ("Determining what constitutes public policy sufficient to protect an at-will employee is a question of law…. [T]he question of whether the public policy was violated is one for the jury."); *Kreb v. Life Flight Network, LLC*, 2018 WL 1277710, at *7 (D. Idaho March 12, 2018) (same). Plaintiff has not shown he was exercising certain legal rights and privileges, or was performing an important public obligation. Further, the claim is duplicative of the wage retaliation claim.

In making this determination, the Court is mindful that "contravention of public policy is a narrow exception to the at-will employment rule." *Venable*, 329 P.3d at 361 (citation omitted). If the exception is "not narrowly construed," it "could eviscerate the rule." *Id*. Although "many activities and interests engaged in by employees benefit the community.... not all of them are recognized as falling within the public policy exception." *Id*. Such is the case here. Accordingly, Defendant's motion for summary judgment will be granted as to the third claim for violation of public policy.

### ii.   Breach of the Implied Covenant of Good Faith and Fair Dealing

"Idaho law recognizes that a covenant of good faith and fair dealing is found in all employment agreements, including employment-at-will relationships." *Howell v. Portneuf Med. Ctr., LLC*, 2018 WL 11469964, at *6 (D. Idaho Aug. 6, 2018) (citing *Mitchell v. Zilog, Inc*., 874 P.2d 520, 526 (Idaho 1994)); *see also Knudsen v. J.R. Simplot Co.*, 483 P.3d 313, 327 (Idaho 2021) (quoting *Van*, 212 P.3d at 992 ("A covenant of good faith and

fair dealing is implied in all employment agreements—including at-will employment relationships."). "The covenant requires the parties to perform, in good faith, the obligations contained in their agreement, and a violation occurs when either party violates, qualifies, or significantly impairs any benefit or right of the other party under the contract—whether express or implied." *Van*, 212 P.3d at 992. "However, the covenant does not create a duty for the employer to terminate the at-will employee only for good cause. The covenant only arises in connection with the terms agreed to by the parties, and does not create new duties that are not inherent in the employment agreement." *Id.* Thus, continued employment is not a benefit inherent in an express or implied-at-will agreement. *Howell*, 2018 WL 11469964, at *6 (citing *Paolini v. Albertson's Inc. Plan Administrator*, 482 F.3d 1149, 1153 (9th Cir. 2007)).

"Whether the alleged factual issues concerning the circumstances of the firing, establish a policy exception to the at-will doctrine is a question of law." *Howard*, 2018 WL 11469964, at *6. Because a good faith and fair dealing claim cannot be used to add additional terms to a contract, *Knudsen*, 483 P.3d at 328 (citing *Van*, 212 P.3d at 992), Plaintiff must demonstrate the existence of a question of fact as to whether Xerox breached an express or implied term of his employment contract in order to fall within the purview of a good faith and fair dealing claim.

Construing all reasonable inferences and facts in favor of the non-moving party, the Court finds that Plaintiff has failed to point to any term or condition of the employment agreement that was breached. Rather, Plaintiff alleges that Xerox interfered with his good faith efforts to negotiate the terms and conditions of his employment, but does not identify

any existing terms of his employment agreement that Defendant allegedly breached. Further, Plaintiff does not dispute that he was an at-will employee. As such, Plaintiff could be terminated with or without cause. *Van*, 212 P.3d at 992. Thus, Defendant did not violate the implied covenant as it relates to any claim that Plaintiff was wrongfully terminated. Absent evidence of an express or implied term of employment that Plaintiff alleges was breached, the implied covenant of good faith claim fails as a matter of law. Accordingly, summary judgment will be granted in favor of Defendant on this claim.

### D.      Claim Four – Negligent Infliction of Emotional Distress

"The elements of negligent infliction of emotional distress [NIED] are 1) a legal duty recognized by law; 2) a breach of that duty; 3) a causal connection between the defendant's conduct and the plaintiff's injury; and 4) actual loss or damage." *Berian v. Berberian, No. 47122*, 2020 WL 6387153, at * 12 (Idaho Nov. 2, 2020) (quoting *Frogley v. Meridian Joint Sch. Dist. No. 2*, 314 P.3d 613, 624 (Idaho 2013)). "Additionally, there must be a physical manifestation of the plaintiff's emotional injury, which is designed to provide a degree of genuineness that claims of mental harm are not imagined." *Id*. (citing *Czaplicki v. Gooding Joint Sch. Dist. No. 231*, 775 P.2d 640, 646 (Idaho 1989)).

Here, Plaintiff argues the legal duties owed arise under the provisions of the IWCA which make up Claims One and Two, and, possibly, a duty of good faith. (Dkt. 86 at 18-19.) "Idaho recognizes the tort of [NIED] where the employer owes the employee a legal duty." *Hatheway v. Board of Regents of Univ. of Idaho*, 310 P.3d 315, 330 (Idaho 2013). A legal duty is one recognized by law that requires the defendant to conform to a certain standard of conduct. *Id*. (citing *Nation v. State, Dep't of Corr.*, 158 P.3d 953, 965 (Idaho

2007)). The IWCA creates an independent legal duty sufficient to support an NIED claim. Because the IWCA claims survive summary judgment for the reasons stated above, Defendant has not shown, as a matter of law, that it did not violate an independent legal duty. Accordingly, the Court will deny summary judgment on the NIED claim to the extent it arises from a duty owed under the IWCA.

However, no legal duty arises from a failure to deal in good faith in the at-will employment context sufficient to sustain a NIED claim. *See Newell v. Farm Bureau Mutual Insur. Co. of Idaho*, 2018 WL 179531, at *2 (D. Idaho April 16, 2018); *Sommer v. Elmore County*, 903 F.Supp.2d 1067, 1075 (D. Idaho 2012); *Rau v. United Parcel Service, Inc.*, 2013 WL 3947147, at * 11 (D. Idaho July 31, 2013). Thus, summary judgment is granted in favor of Defendant to the extent the NIED claim is premised on the breach of any duty of good faith. Likewise, "the mere termination of an at-will employee – without more – does not constitute the breach of a duty sufficient to support an NIED claim." *Bollinger*, 272 P.3d at 1274. Thus, the NIED claim is dismissed to the extent it is based upon any alleged wrongful termination untethered from the statutory wage retaliation claim.

## **ORDER**

NOW, THEREFORE IT IS HEREBY ORDERED as follows:

1. Plaintiff's Motion for Partial Summary Judgment (Dkt. 76) is **DENIED**.

2. Defendant's Motion for Summary Judgment (Dkt. 80) is **GRANTED IN PART AND DENIED IN PART** as follows:

a.  Summary Judgment is GRANTED in favor of Defendant on Claim
    Three and GRANTED IN PART on Claims Two and Four, as stated
    herein.

b.  Summary Judgment is DENIED on Claim One and DENIED IN PART
    on Claims Two and Four, as stated herein.

3.  Defendant's Motion to Strike (Dkt. 83) is **GRANTED IN PART AND
    DENIED IN PART**.

IT IS FURTHER ORDERED that the parties must confer and notify the Court as
to how they intend to proceed in this matter no later than **July 10, 2023**.

DATED: June 6, 2023

Honorable Debora K. Grasham
United States Magistrate Judge